**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| HUMAN POWER OF N COMPANY, | |
| Plaintiff, | Case No. 1:26-cv-00374-ADA-ML |
| v. | |
| AMBROSIA BRANDS, LLC, | |
| Defendant. | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**</u>

Plaintiff Human Power of N Company ("Humann") responds to Defendant Ambrosia Brands, LLC's ("Ambrosia") combined motion to dismiss Humann's complaint, or in the alternative, for a more definite statement (Dkt. 16).

### INTRODUCTION

Ambrosia's motion is nothing more than a delay tactic to avoid responding with substance to Humann's well-pleaded complaint, and it is revealing that Ambrosia does not argue that its representations are true or even permissible puffery. Humann's complaint was sufficiently pled *before* Humann elected to amend its pleading pursuant to Rule 15, and even more so considering the additional allegations and facts in its first amended complaint ("FAC," Dkt. 14). Ambrosia's motion is particularly without merit because even if the representations actually discussed in Ambrosia's motion were dismissed for any reason, the FAC identifies many additional

1

false representations *not* discussed in Ambrosia's motion that would give rise to *separate* claims for false advertising.

Ambrosia believes "conclusory" is magic word that makes allegations implausible or insufficient under notice pleading standards, but this belief is misplaced. Humann's original complaint and FAC alleged exactly why Ambrosia and its influencers' representations about the efficacy and benefits of the Ambrosia beetroot product were false: because no product with the level of nitrate or ingredients contained in Ambrosia's recommended serving size could possibly deliver the clinically relevant amounts of nitrate to confer health benefits. Humann's FAC also identifies several other false representations not related to the health benefits of Ambrosia's products that are no less false and actionable.

Ambrosia also comes across as disingenuous when it argues that it did not induce third parties to engage in improper advertising. This is particularly glaring in light of the new evidence added to the FAC clearly showing Ambrosia's principal boasting about the significant compensation and "elite coaching" provided to Ambrosia's influencers. These facts are not "conclusory," except that they *conclusively* establish that Ambrosia has orchestrated and funded a weaponized, and false, advertising racket.

Humann has pled legally sufficient facts for its claims. When viewed in the light most favorable to Humann, as is required, the FAC easily satisfies the notice pleading standard. At a minimum, Humann should be entitled to explore Ambrosia's conduct and the underlying facts in discovery.

FACTS

### 1.  Humann and its SUPERBEETS products

Humann is an industry leader in functional food and nutritional supplements for human health. Dkt. 14, ¶7. Founded from scientific research at the University of Texas, the science behind Humann's products have been validated and vetted by a premier team of doctors and nutritionists. *Id.*

Among Humann's first and most popular products are its SUPERBEETS heart chews and dietary supplements. *Id.* ¶8. Humann's SUPERBEETS products harness the measurable health benefits of nitrates, found naturally in beets, to support the body's generation of nitric oxide. *Id.* However, to provide sufficient clinical benefits, Humann includes crucial additional ingredients, such as fermented beet root powder or grape seed extract. *Id.*

This is a key distinction between Humann's products and others' products that claim to use beet root to provide similar benefits. Without additional ingredients like fermented beet root powder and grape seed extract, beet root alone cannot deliver sufficient amounts of nitrate or dietary nitrite to provide scientifically established benefits. *Id.* This science has been thoroughly vetted by a robust body of clinical research and peer-reviewed studies, including studies in 2017, 2018, and 2021 in various academic journals. *See id.* ¶¶11–13.

### 2.  Ambrosia's false advertising campaign

Ambrosia does not appear to dispute the facts relating to its false advertising campaign, it just labels any damaging fact as "conclusory." *See, e.g.*, Dkt. 16, ¶3.

3

Although there does not seem to be any dispute about the material facts asserted in Humann's complaint, Humann identifies the facts relevant to Ambrosia's motion to dismiss here.

Ambrosia operates a competing business under the brand name "Rosabella." *Id.* ¶18. Ambrosia sells nutritional supplements based on beetroot and beetroot byproducts and solicits those products to a target audience similar to, if not identical to, Humann. *Id.* ¶19. Beginning as early as July 2025, Ambrosia began to make unfounded, unsubstantiated, and incredible claims about the efficacy and health benefits of its competing product. *Id.* ¶22.

For example, Ambrosia directly represents that its capsules:

- "aid[] healthy circulation", *id.* ¶27;

- "assist[] athletic performance", *id.* ¶28; and

- "offer superior potency . . . compared to leading beetroot powder organic brands." *Id.* ¶29

These claims are not just unsubstantiated by the nutritionist or scientific community. The claims are made impossible by the ingredients contained in Ambrosia's products. Dkt. 14, ¶24. Humann's own testing of Ambrosia's product indicates that a serving of two capsules of Ambrosia's beetroot powder contains 11.2 mg of nitrate. *Id.* Any clinical benefit from nitrate alone would require approximately 400mg of nitrate, an order of magnitude more than the amount nitrate in Ambrosia's recommended serving size. *Id.* Unless Ambrosia is suggesting that consumers should

4

take thirty-five doses of its product, any representation about a clinical benefit from Ambrosia's product *must be false. Id.*

Other claims, which Ambrosia entirely ignores in its motion, do not require any independent testing of the product contents or underlying science to prove false. For example:

- Ambrosia claims its products are "made with natural ingredients" and are "100% vegan." *Id.* ¶30.

- Ambrosia claims its products are "expertly crafted by top cardiovascular health specialists and backed by cutting-edge science." *Id.* ¶32.

- Ambrosia claims its products are "CGMP certified." *Id.* ¶34.

- Ambrosia claims its products are "Made in USA." *Id.* ¶38.

Ambrosia does not discuss these four representations in its motion, presumably because these representations are facially false. *See id.* ¶¶31, 33, 35–37, 39–42. At a minimum, these additional claims that Ambrosia does not even address provide a basis to deny Ambrosia's motion to dismiss.

### 3. Ambrosia's legion of bogus influencers

Around the time Ambrosia began making direct, false representations, Ambrosia also began orchestrating a misinformation campaign on TikTok. *Id.* ¶47. To propagate this campaign, Ambrosia solicits, compensates, trains, coaches, and directs a veritable army of social media influencers. *Id.* ¶¶64–73.

These influencers' tactics take Ambrosia's false representations several steps further, because the influencers often use generative artificial intelligence to

masquerade as doctors, consumers who experienced health benefits, or members of certain ethnic groups who are now willing to share "secrets" with the public. *See, e.g.*, Dkt. 14, ¶¶54–63. This creates a separate level of deception, as consumers who view such video promotions may reasonably believe that Ambrosia's products are endorsed by medical professionals, other consumers, or influential members of certain ethnic groups.

Ambrosia pays marketing consultants to orchestrate this scheme. *Id.* ¶71. Luca Washenko, one of Ambrosia's paid marketing consultants and "lead coaches" for the influencer marketers, brags about how much money Ambrosia's influencers can make if they join Ambrosia's private Discord channels for content creators. *Id.* ¶¶71–73. In his own words, Ambrosia provides "elite coaching and support" to its influencer network. *Id.* ¶73.

### LEGAL STANDARD

A motion to dismiss under 12(b)(6) is "viewed with disfavor and is rarely granted." *Turner v. Pleasant,* 663 F.3d 770, 775 (5th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a pleading must "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56. When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the pleader as true and draws all accept all well-pleaded

facts as true and draw all reasonable inferences in favor of the nonmoving party. *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 331 (5th Cir. 2024).

To sufficiently allege a claim for false advertising under the Lanham Act, a plaintiff must allege facts making it plausible that (1) the defendant made a false or misleading statement of fact about a product; (2) such statement either deceived, or had the capacity to deceive a substantial segment of potential customers; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *Austin's Natural Frozen Pops, Inc. v. Jonny Pops, LLC*, 809 F. Supp. 3d 476, 483 (W.D. Tex. 2025). With respect to the materiality of an alleged misleading statement, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. *Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 497 (5th Cir. 2000).

## ARGUMENT

Ambrosia mischaracterizes Humann's false advertising claims as "predicated" on a "lack of substantiation" theory. Dkt. 16 at 8. This sweeping generalization deliberately ignores the facts that directly contradict Ambrosia's claims about its products, and it disingenuously characterizes an entire complaint based on a handful of false representations.

Broadly speaking, Ambrosia's logic doesn't pass muster. If Ambrosia's position was the law, there would be nothing to stop companies from making fantastical

claims about products since they could rely on the "lack of substantiation" defense that Ambrosia invents. If a company claimed that its soda could make a consumer fly, it should not take more than a test of that claim to disprove it. Soda alone cannot possibly make a human fly, just as Ambrosia's products cannot confer the benefits Ambrosia claims.

## I.     Humann adequately pleads its false advertising claims under sufficient theories of falsity.

Curiously, Ambrosia is not arguing that it lacks notice of Humann's claims or that Humann fails to adequately allege them, as might be expected (and required) in a motion to dismiss. Instead, Ambrosia's motion objects to some undefined, non-specific group of claims that Ambrosia asserts are barred because Humann relies on a lack of substantiation theory of false advertising. Dkt. 16 at 8.

Ambrosia provides apparently non-exhaustive "examples" of claims that apparently fall into this category, identifying paragraphs 27, 28, 44-45, and 53 of the FAC. Dkt. 16 at 4. But despite Ambrosia's inappropriate mischaracterization of Humann's allegations, Humann does not allege that Ambrosia's misrepresentations about these supposed health benefits of its products are false *only because* they cannot be substantiated. Within the same paragraphs and immediately following the select language quoted by Ambrosia in its motion, Humann specifically alleges that Defendant's products do not contain key ingredients that could render the claimed health benefits, making those claimed benefits impossible. *See* Dkt. 14, ¶23 ("*But beyond lacking scientific or academic substantiation* . . . Defendant's products do not contain any of the additional ingredients, such as fermented beetroot powder or grape

8

seed extract, that would deliver nitrate, nitrite, or other ingredients in dosages necessary to deliver clinical benefits.") (emphasis added); ¶27 ("the ingredients and quality of Defendant's product cannot provide the health benefits that Defendant represents"); ¶28 (same). This fact must be taken as true at the motion to dismiss stage. *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009). The claims identified in paragraphs 44, 45, and 53 are false for the same reason—it is simply not possible to create the claimed health benefits from beetroot alone. Only with the addition of fermented beetroot powder or grape seed extract can humans obtain nitrate and nitrites in sufficient doses for any measurable clinical benefit. *Id.* ¶23. This fact *is* substantiated by Humann's own independent research and testing of Ambrosia's products. *Id.* ¶24.

Ambrosia argues that Humann's independent research and testing of Ambrosia's products is not sufficient, or just another way to say Ambrosia has not substantiated it claims. Dkt. 16 at 10. This argument fails for the same reasons already discussed, because Humann also alleges facts (which must be accepted as true) that a serving size of Ambrosia's products do not contain sufficient levels of nitrate to confer any clinical benefits. Dkt. 14, ¶24. Whether or not Ambrosia tested its products in a clinical or scientific setting, which Humann very much doubts, Humann's separate allegations about the quality and ingredients of Ambrosia's products are sufficient to state a claim.

Ambrosia asks this Court to dismiss Humann's entire complaint, but Ambrosia ignores numerous other claims which do not require any testing or close examination

of the ingredients or underlying science to prove false. Dkt. 14, ¶¶30, 32, 34, and 38 (claims related to Ambrosia's natural ingredients claim, "100% vegan" claim, "expertly crafted by top cardiovascular health specialists" claim, CGMP certified claim, and "Made in the USA" claim). These representations are demonstrably false for the reasons alleged in Humann's FAC. *See* Dkt. 16, ¶¶31, 33, 35–37, 39–42. By failing to object to these allegations, Ambrosia appears to concede that Humann states an adequate claim for these products, and as such, the Court should refuse Ambrosia's requested relief of dismissing the FAC. Dkt. 16 at 17.

In short, Humann's FAC adequately pleads that Ambrosia has made numerous claims that are literally false or misleading, and Ambrosia's motion does not show that Humann has failed to state claims for false advertising. The Court should not dismiss Humann's FAC, either in full or in part.

## II. Humann adequately pleads the elements for contributory false advertising.

Ambrosia's argument that Humann does not allege facts plausibly showing that Ambrosia does not induce its army of social media influencers—whom Ambrosia pays, directs, scripts, and otherwise organizes—is laughably disingenuous. Humann specifically alleges that Ambrosia compensates its influencers for misinformation through direct payments and unambiguous "paid partnership" tags on TikTok. Dkt. 14, ¶¶67, 71–73. Humann alleges that Ambrosia operates, controls, and solicits content creators and influencers into a private Discord channel. *Id.* ¶68. Humann alleges that on that private channel, Ambrosia provides a 10-hour marketing training course on advertising Ambrosia's products using messaging guides and scripts. *Id.*

10

Ambrosia's own marketing consultant promises "elite coaching and support"—as well as six-figure payments—to the influencer network. *Id.* ¶73. What's more, the fact that numerous, seemingly independent influencers follow the same racially charged messaging scripts should raise the more-than-plausible inference that the script came from Ambrosia. *See, e.g., id.* ¶¶60–63. Accepting these allegations as true, as is required, there is no question that Humann has plausibly alleged Ambrosia's sufficient control and agency over its influencer network.

This conduct is not "the mere sale of products in the course of an ordinary business relationship," as Ambrosia suggests. Dkt. 16 at 12. In an ordinary business relationship, influencers do not repeat the same, scripted false representations about a product. Nor is it "ordinary" for a brand owner to pay, direct, coach, and support advertisers yet simultaneously disclaim all responsibility for those advertisers' representations. Advertisers have been held responsible for third parties operating on their behest in similar relationships. *Merck Eprova AG v. Brookstone Pharmaceuticals, LLC*, 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013) (advertiser induced the national pharmaceutical databases to make misleading claims by providing database with mislabeled products); *Berkley Vacation Resorts, Inc. v. Castle L. Grp., P.C.*, Case No. 18-CV-60309, 2019 WL 5213310, at *7-8 (S.D. Fla. Aug. 15, 2019), report and recommendation adopted, No. 18-60309-CIV, 2019 WL 5208953 (S.D. Fla. Sept. 5, 2019) (defendant found liable for third party where it supervised and controlled the third party's marketing and representations). Additionally, numerous courts have allowed contributory false advertising claims to proceed where

11

advertisers paid for statements by the third party or provided the third party with materials. *Roadget Bus. PTE. Ltd. v. PDD Holdings Inc.,* Case No. 24-2402, 2026 WL 44864, at *22 (D.D.C. Jan. 7, 2026) (holding that a claim for contributory false advertising is actionable when it is based on paid influencer statements); *Wyndham Vacation Ownership, Inc. v. Clapp Bus. L., LLC*, 411 F. Supp. 3d 1310, 1319 (M.D. Fla. 2019) (same; the third party was paid by the advertiser and received a significant portion of their revenue through the scheme); *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1332 (S.D. Fla. 2021) (same; defendants gave the third party the certifying stamp and authorized them to use it).

Again, Ambrosia incredibly argues that Humann's allegations regarding the influencers' representations all amount to "lack of substantiation" theories of falsity. Dkt. 16 at 12–13. This deliberate ignorance of Humann's pleadings is without credibility or merit. Humann specifically alleges that the influencers' representations are false for several reasons, including that the influencers masquerade as doctors purporting to provide medical advice using generative artificial intelligence, Dkt. 14, ¶54–56, or pretend to be consumers who lost significant amounts of weight only by consuming Ambrosia's products and not through diet or exercise. *Id.* ¶55–58. Because Ambrosia's influencers deceive viewers using generative artificial intelligence, there is no "substantiation" required to disprove these claims. These are fake doctors and fake customers. And more importantly, these are fake health benefits promised by these artificial messengers.

Even assuming Ambrosia's influencers could not be held accountable for their deceptive masquerade as medical professionals or consumers, the influencers should be held liable for the substance of their representations. Again, Humann adequately alleges that the ingredients and nitrate content used in Ambrosia's products cannot possibly deliver any clinical benefit, regardless of whether Ambrosia has substantiated the claims represented. Dkt. 14, ¶24. The Court's analysis can begin and end with that well-pleaded fact.

## III.    Humann's first amended complaint provides fair notice of its claims.

It is troubling that Ambrosia can argue the merits of Humann's false advertising claims then turn face and argue it has no fair notice of those same claims. All that Rule 8(a) requires is a "short and plain" statement of pleadings that provide a defendant with notice of plaintiff's claims and the supporting grounds. Fed. R. Civ. P. 8(a).

Humann easily meets that low threshold. Humann alleges no fewer than twenty separately actionable misrepresentations made by Ambrosia or its influencers that are all false. Dkt. 14, ¶¶27–30, 32, 34, 38, 45, 49–51, 55–58, 60–63. Humann's FAC provides direct quotes of these misrepresentations and explains why they are false. If Ambrosia cannot divine Humann's legal claims from these numerous examples, Ambrosia is being willfully blind.

There is no merit to Ambrosia's request for a more definite statement. The Court should deny this relief.

## CONCLUSION

Humann has adequately stated a claim for false advertising under both a direct and contributory theory of liability. Because Humann has sufficiently stated a claim, there is no merit to Ambrosia's request to dismiss the first amended complaint or for a more definite statement.

DATED: July 20, 2026                    Respectfully submitted,

                                        /s/ *Stephen P. Meleen*
                                        Stephen P. Meleen
                                        TX Bar No. 00795776
                                        Daniel S. Martens
                                        TX Bar No. 24116722
                                        PIRKEY BARBER PLLC
                                        1801 East 6th Street, Suite 300
                                        Austin, Texas 78702
                                        (512) 322-5200
                                        (512) 322-5201 (fax)
                                        smeleen@pirkeybarber.com
                                        dmartens@pirkeybarber.com

                                        *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on July 20, 2026, a copy of the foregoing was filed with the Clerk of Court using the ECF system, which will send notification of such filing to all attorneys of record.

/s/ *Stephen P. Meleen*